# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

H. THAYNE DAVIS,                    :

     Plaintiff,                    :          Case No. 3:04cv00059

 vs.                                :          Chief Magistrate Judge Sharon L. Ovington

LIFETIME CAPITAL, INC.,             :

     Defendant.                   :

## DECISION AND ORDER

## I.  **Background**

Starting in 1997 and continuing for about six years, 4,000 or so people invested in

LifeTime Capital, Inc.  At the time of the investments, LifeTime appeared to be in the

legitimate business of selling financial interests in viatical settlements – life insurance

policies sold by terminally ill beneficiaries (viators) for tax-free cash.  Investors' goal was

to obtain large financial gain from their investments in a relatively short amount of time.

Realization of this goal depended on viators dying within the specific time periods

projected by LifeTime, which exposed LifeTime investors to large financial risk.

"[I]nvestors [in viatical settlements] risk a reduction of their return or a complete loss if

the viator does not die within the time projected because the investor must continue to pay

the premiums on the policy as they accrue or the policy will lapse."  *United States v.*

*Svete*, No. 3:04CR10/MCR, 2014 WL 941448, at *4 (N.D. Fla. Mar. 11, 2014).

This receivership case arose mainly as a result of the misdeeds of David A. Svete, a fraudster later convicted (along with others) of numerous federal criminal offenses.[1] His criminal activities involved LifeTime and other businesses he incorporated to offer "financial, office, marketing, and viatical services. [His] control of these corporations was secreted, thus misleading investors and providing an avenue to launder money taken by fraud." *Svete*, 2014 WL 941448, at *2. Svete an others scammed millions of dollars from investors. He is presently in federal custody, serving a 200-month sentence.

In February 2004, near the time Svete was indicted, LifeTime faced imminent financial collapse. Its investors faced the very real danger that they would never see even a penny of the money they had invested. This dire situation necessitated judicial intervention, creation of the LifeTime Receivership, and appointment of a Receiver and an Examiner.

The purpose of the LifeTime Receivership was to obtain the best possible recovery for LifeTime's investors, many of whom were characterized during Svete's sentencing proceedings as "vulnerable victims," *id*. at *1, more than one-third of whom were over age 65. *Id*. at *5. Once the Receivership began, years of work followed to locate LifeTime investors and secure the assets of LifeTime to prevent waste of the assets and to find and recover money Svete and others laundered through LifeTime and its related

---

[1] Svete's crimes included multiple counts of mail fraud, conspiracy to engage in money laundering, money laundering, and interstate transportation of money obtained by fraud. *Id* 2014 WL 941448, at *2-*3.

businesses.  Although the Receiver recovered millions of dollars, LifeTime investors

faced a harsh reality thanks to Svete and others: The money the Receiver found was

nowhere near enough to return to each investor the total amount he or she had invested in

LifeTime.

Today, all but six of the approximately 4,000 LifeTime investors have either

waived their claims or agreed to settle their claims with the Receiver and thereby obtain a

partial pro rata return on their original investment in LifeTime.  The six remaining

investors had multiple opportunities to join a settlement of their claims.  They chose not

to.

In March 2014, the six remaining investors were permitted to intervene and they

have since have filed Complaints against the Receiver and the Receivership raising a

claim of conversion.  (Doc. #s 1439-1443).  Their Complaints are presently pending along

with the Receiver's Motion for Summary Judgment (Doc. #1486), the six remaining

investor/Plaintiffs' (Plaintiffs') Responses (Doc. #s 1489, 1491, 1493, 1495), the

Receiver's Reply (Doc. #1497), Plaintiffs' Motions for Leave to Amend Complaint (Doc.

#s 1488, 1490, 1492, 1494), the Receiver's Memorandum in Opposition (Doc. # 1498),

and the record as a whole.

## II.    The Jordan Policies and Plaintiffs' Claims

Plaintiffs are Johnnie C. Ivy, Nena Ellison, Ernest Storms, Jacquelyn Storms, Jane

Ivy-Stevens, and Robert Burgess.[2]  Their conversion claims concern the Receiver and the Receivership's handling of death benefits from life-insurance policies from LifeTime viator, Mr. Jordan.

Plaintiffs state in their Complaints that they obtained their interests in the proceeds of Mr. Jordan's life insurance policies while Mr. Jordan was still alive.  Mr. Jordan died on February 4, 2004, about two weeks before the Lifetime Receivership was created.  On the date Mr. Jordan died, LifeTime owned two $3,000,000.00 life insurance policies concerning Mr. Jordan.  (Doc. #1112, *PageID* #12231).  Plaintiffs were among the LifeTime investors whose investments were allocated to the Jordan policies.

Due to the imminent financial collapse LifeTime in February 2004, this Court took exclusive jurisdiction and possession of LifeTime's assets, "including, without limitation, all viatical and life settlement insurance policies, including beneficial interests therein and proceeds thereof ...."  (Doc. #5).  LifeTime's assets thus became Receivership assets in February 2004.  The Receiver at this time was authorized, in part, "to receive and collect any and all sums of money due and/or owing to LifeTime, whether the same are now due or shall hereafter become due and payable, and is authorized to incur such expenses and make such disbursements as are necessary and proper for the collection, preservation, maintenance and operation of the Receivership Assets."  (Doc. #6, ¶11).

---

[2] The Complaints also assert identical claims of negligence against the Examiner. The Court previously found those claims legally insufficient and struck them from the record.  (Doc. #1444, *PageID* #s 15070-71; Doc. #1449). As a result, Plaintiffs' proposed Amended Complaints do not contain negligence claims against the Examiner.

4

In May 2004, Mr. Jordan's life insurance company paid the Receivership the benefits from his life insurance policies, equaling $6,048,786.00. Because of this, and because Mr. Jordan died before the Receivership was created, a dispute arose in the Receivership action over who was entitled to the proceeds from Mr. Jordan's policies. Did the proceeds belong to the more than 200 investors – including Plaintiffs – whose investments with LifeTime were allocated to the Jordan policies? Or, did the proceeds belong to the Receivership (subject to later distribution)?

After extensive briefing of the ownership issues, the Jordan Investors' claims proceeded to mediation in March 2006, which resulted in a settlement agreement between nearly all of the Jordan Investors and the Receiver. Under the agreement, the Receiver would pay 62.5% of the total amount each Jordan Investor originally invested in LifeTime that was allocated to the Jordan policies.[3] The Jordan Investors would, in return, release their claims against the Receivership concerning their original LifeTime investment and the Jordan-policy proceeds. After a fairness hearing, which Plaintiffs did not attend (Doc. #1207, *PageID#* 12948), the Court approved the settlement (Doc. #543).

Nearly all of the Jordan Investors returned a claim form or a release concerning their respective portions of the Jordan-settlement proceeds. As of March 2010, only thirteen Jordan Investors, including Plaintiffs, had not. The Receiver therefore filed a motion for instructions, asking for leave to send a final notice to the remaining Jordan

---

[3] "In comparison, general investors in LifeTime were only to receive 16.6392% of their original investment." (Doc. #1207, *PageID* at 12948).

5

Investors informing them that if they did not return a completed claim form within 30 days, the Receiver would file a motion to disallow their claims. After two separate hearings, the Receiver's motion was granted.

The final notice then issued and additional Jordan Investors responded. As explained and anticipated by the final notice, the Receiver filed a motion to disallow the claims of the remaining Jordan Investors who did not return a claim or release. The matter was set for a fairness hearing on August 23, 2010. (Doc. #1139).

Before the fairness hearing, the Court received letters (which were docketed in the case record) from the remaining investors, now Plaintiffs. They explained that they did not accept the Jordan settlement agreement, and they continued to claim their full share of the Jordan-policy benefits. (Doc. #1141, *PageID* at 12460; Doc. #1142, *PageID* at 12462; Doc. #1143, *PageID* 12465). Additional similar letters from Plaintiffs followed (and were docketed). (Doc. #s 1147-56).

After the fairness hearing, and consideration of Plaintiffs' letters, this Court granted the Receiver's Motion to Disallow their claims. Because Plaintiffs apparently received bad advice from a non-party and because they faced losing the percentage they were entitled to under the Jordan settlement – and, thus, all of their original investment – the Court provided them another opportunity to join, within thirty days, the Jordan settlement. (Doc. #1207; Doc. #1304, *PageID* at 13892). The Order proving this further opportunity to Plaintiffs further directed that after the thirty-day period expired (plus

6

reasonable mailing time), "the Receiver shall disallow the participation or claim of any remaining Jordan Investor in the settlement agreement approved by the Court on April 4, 2006." (Doc. #1207, 12958-59). This Court also explained, "nothing in this Order is intended to either require their participation in the Jordan settlement or limit the right of any remaining Jordan Investor to pursue any independent legal action that may be available to them should they decide not to participate." *Id*. at 12956. Plaintiffs chose not to participate in the Jordan settlement.

Several remaining Jordan Investors appealed the Court's disallowance Order without success. In September 2014, the U.S. Court of Appeals for the Sixth Circuit affirmed the disallowance Order, finding no abuse of discretion and no denial of due process. (Doc. #s 1304, 1305).

In March 2014, this Court granted Plaintiffs' Motion to Intervene. (Doc. #1384). In October 2014, Plaintiffs were granted leave to file pleadings in compliance with Fed. R. Civ. P. 24(a). (Doc. #1430). Those pleadings are Plaintiffs' presently pending Complaints. Plaintiffs allege in support of their conversion claim:

> 18.    The funds [the Receiver] and/ the LifeTime Receiverhip did not belong to LifeTime or the receivership created as of February 20, 2004. The Jordan policy proceeds were not assets of LifeTime. Accordingly, [the Receiver's] possession, dominion and control of the Jordan policy proceeds was without valid legal basis and wrongful.

> 19.    [The Receiver's] and/or the LifeTime Receivership's use and dissipation of the Jordan policy proceeds constitutes the unauthorized and wrongful assumption and exercise of dominion and control over the proceeds, which are the personal property of [Plaintiffs].

20.    As a result of the wrongful assumption and exercise of dominion and control over the Jordan policy proceeds, [Plaintiffs have] sustained damages, for which [they are] entitled to recover from ... the Receiver and/or the LifeTime Receivership.  LifeTime and [the Receiver] are each liable to [Plaintiffs].

(Doc. #s 1439-1443).  Plaintiffs assert that the Receiver is personally liable to them for compensatory and exemplary damages.

The Receiver and Receivership seek summary judgment in their favor on Plaintiffs' conversion claim.

## III.    <u>Motions for Summary Judgment</u>

A party is entitled to summary judgment if there is no genuine dispute over any material fact and if the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011).

To resolve whether a genuine issue of material fact exists, the Court draws all reasonable inferences in the light most favorable to the non-moving party.  *Richland Bookmart, Inc. v. Knox County, Tenn*., 555 F.3d 512, 520 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587-88 (1986)).  With these reasonable inferences in the forefront, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Jones v. Potter*, 488 F.3d 397, 402-03 (6th Cir. 2007) (quoting, in part, *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 251-52 (1986) and citing *Matsushita*, 475 U.S. at 587). "Accordingly, '[e]ntry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (citations omitted).

## IV.  <u>Discussion</u>

Plaintiffs' pro se Complaints assert jurisdiction under 28 U.S.C. §1332 based on diversity of citizenship.  Plaintiffs do not identify or cite to a particular state's law in support of their conversion claim.

The Receiver contends that summary judgment is warranted on Plaintiffs' conversion claim because their claim is time barred under the applicable Oklahoma two-year statute of limitations.  The Receiver notes that each Plaintiff is a citizen of Texas, and he, the Receiver, is a citizen of Oklahoma.  He correctly relies on the principle that a federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits, Ohio in this case.  *See Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Muncie Power Products, Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003).  He then journeys through Ohio's choice-of-law rules to arrive in Oklahoma and apply its two-year statute of limitations to find Plaintiffs' conversion claim time barred.  Plaintiffs further contend that Oklahoma's law does not recognize a cause of action for conversion of money.

Plaintiffs counter (in part) that the Receiver has failed to show that Oklahoma law applies and has not specified when the Jordan Investors' conversion claim accrued. Plaintiffs contend that Ohio law applies and that their conversion claim is timely under Ohio's four-year statute of limitations. Returning to Oklahoma law, Plaintiffs argue that even if there can be no conversion of money under Oklahoma law, another cause of action under Oklahoma law – namely, a "thing in action" – supports their claim to recover money. They thus seek to amend their Complaints to add a "thing in action" claim. With this added claim, they conclude that their Complaints state a claim upon which relief can be granted.

The parties' first present their choice-of-law contentions followed by their focus on Plaintiffs' conversion and thing-in-action claims. In some cases, the better course of action, is to first determine which state's law apply rather than addressing claims on their merits under different state law. *E.g., Maxum Indem. Co. v. Drive W. Ins. Servs., Inc.*, No. 15-3199, 2015 WL 7292722, at *4 (6th Cir. Nov. 18, 2015). In the instant case, however, there are overwhelming reasons to address Plaintiffs' conversion and thing-in-action claims on the merits. First, the parties' appear to overlook that the LifeTime Receivership was created in Ohio and that the Orders appointing the Receiver and granting the Receiver with power to protect LifeTime's assets for the benefit of investors were issued by this Court in Ohio. The Receivership, moreover, remains subject to this Court's Orders in Ohio. Because the parties have not addressed these central facts in

10

their choice-of-law contentions, further briefing would be required to determine where the alleged conversion occurred and to otherwise promote a thorough consideration of which state's law applies to Plaintiffs' conversion claim.

Second, the parties do not address whether any choice-of-law provisions exist in the contracts Plaintiffs entered with LifeTime or its agents or related businesses concerning their investments with LifeTime and in the Jordan viatical settlement. While this might not be pertinent to the choice-of-law analysis because Plaintiffs raise tort claims, rather than a breach-of-contract claim, Plaintiffs' tort claims arise from their asserted ownership interest to the Jordan-policy benefits, which arises by operation of contract. Given this complication, which the parties have not addressed, any present determination of which state's law applies would not be well informed.

Third, Plaintiffs' conversion and thing-in-action claims are so lacking in legal basis that it is more practical and efficient, and better case management, to address them now in substance rather than order further briefing on choice-of-law issues and imposing additional delay and expense upon Plaintiffs and the Receivership.

Turning to Plaintiffs' conversion claim, the Receiver is correct that under Oklahoma law, conversion is not generally based on a monetary loss and, instead, is based on converted "tangible personal property." *See Shebester v. Triple Crown Insurers*, 826 P.2d 603, 608 (Okla. 1992). Oklahoma law considers conversion based on monetary loss to involve "intangible personal property." *Id*. Plaintiffs seek to recover such

11

intangible personal property, money from their ownership interests in the Jordan-policy benefits. Because conversion under Oklahoma law is in general based on tangible, rather than intangible, personal property, Plaintiffs' conversion claim fails as a matter of Oklahoma conversion law. *See id*. at 608 and n.16 (quoting 60 O.S. 1981 §312 ("A thing in action is a right to recover money or other personal property, by judicial proceedings.")) (other citations omitted); *see also Childs v. Unified Life Ins. Co*., 781 F. Supp.2d 1240, 1249 (N.D. Okla. 2011) (and cases cited therein).

Additionally, Oklahoma law requires proof of ownership to establish both conversion and thing-in-action claims. *See Brown v. Oklahoma State Bank & Trust Co. of Vinita*, 960 P.2d 230, 233 and n. 4 (Okla. 1993) ("For simplicity...," characterizing a chose-in-action to recover money as a conversion claim); *see also United States v. Lowrance*, 2002 WL 31689525 at *2 (N.D. Okla., Oct. 17, 2002). In Oklahoma, "Before the issue of conversion can be decided, ownership must be established." *Brown*, 960 P.2d at 233. Similarly, in Ohio, "[u]nder Ohio law, conversion is 'the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights.'" *McCaughey v. Garlyn Shelton, Inc*., 208 F. App'x 427, 435 (6th Cir. 2006) (quoting, in part, *Joyce v. Gen. Motors Corp*., 49 Ohio St.3d 93, 551 N.E.2d 172, 175 (1990)).

Plaintiffs assert that they obtained ownership interest in the Jordan-policy proceeds upon the death of Mr. Jordan two weeks before the Receivership was created. The issue

of who owned the Receivership, however, was effectively resolved in April 2006 by the Jordan settlement, after a fairness hearing. By approving the Jordan settlement, the Court and the parties to the settlement effectively recognized the ownership interests of all the Jordan Investors. That is why so much care was taken to notify the Jordan investors that they could participate in, or challenge the fairness of, the Jordan settlement agreement. During the years after the Court approved the Jordan settlement agreement, persons with ownership claims to the Jordan-policy proceeds were given repeated and ample notice of the Jordan settlement and a lengthy amount of time to submit a claim and thus establish their ownership interests in the Jordan settlement. Plaintiffs did not do so. They instead held fast to their conclusion that they were entitled to receive the entire amount of their ownership interests in the Jordan-policy proceeds.

Their conclusion, however, overly focuses on the matured status of the Jordan policies and blindly dismisses the fact that some LifeTime investors rescued, albeit temporarily, LifeTime from financial collapse. Again, the culprit was Svete and others. The district court in Svete's criminal case explained:

> [LifeTime] Investors were ... told that an independent investment servicing company maintained a premium reserve account for the purpose of underwriting the policies. This company was created and controlled by Defendant and lacked sufficient funds to pay premiums on purchased policies as they came due when the viators lived longer than expected. Investors were thus obligated to make additional premium payments in order to avoid a total loss of their investment.

*United States v. Svete*, 2014 WL 941448, at *5 (N.D. Fla. Mar. 11, 2014). Com-mingling

13

of funds set aside for servicing the life insurance policies also occurred. For example, premiums due for one group of life insurance policies would be made with money taken from sub-accounts dedicated to another group of policies. Svete and others thus robbed Peter to pay Paul, a strategy designed for failure once LifeTime stopped soliciting new investors and new cash stopped propping up LifeTime's rickety financial structure. *See* Doc. #82, *PageID* 1009. The commingling occurred so extensively that it eventually became impossible to sort out which particular Investors had staved off LifeTime's collapse for the benefit of all Investors, including the Jordan Investors. What can be sorted out is the fact that without the help of some Investors, LifeTime would have collapsed or faced imminent collapse before Mr. Jordan died. If that had occurred, the Jordan Policies would have lapsed and the Jordan Investors would have lost their entire investments.[4]

These aspects of the fraud and resulting financial condition of LifeTime made it equitable for the Receivership to distribute assets to remaining Investors on a pro rata basis. *See Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 426 (6th Cir. 2005). This was accomplished by Court approval of various settlement agreements between the Receiver and nearly all Investors. Those Investors who joined the settlement agreement regarding the Jordan Policies obtained a pro rata distribution of 62.5% of their original investments. This was about three times more than the return Investors in non-matured

---

[4] Plaintiffs' original investments ranged from $3,000 to $7,500. (Doc. #878, Exhibit 8 at 7-8).

14

policies received.  No Investor received more than their respective pro rata distribution because of how massively unfunded LifeTime was at the start of the Receivership.  In this way, the LifeTime Receivership is similar to typical receiverships.  *See Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 552 (6th Cir. 2006) ("The inability of a receivership estate to meet all of its obligations is typically the *sine qua non*[5] of the receivership.").

Despite these realities, Plaintiffs held fast to their belief that they were due the original amount of their investment in the matured Jordan policies.  The Court's Order on November 11, 2011 (Doc. #1207) disallowed Plaintiffs' claims to the Jordan settlement, after giving Plaintiffs another thirty days to join the settlement.  By granting the Receiver's Motion to Disallow, the Court granted the Receiver's request to allocate the remaining Jordan-policy proceeds "'among the Investors whose claims have been previously confirmed and approved by the Court.'"  (Doc. #1207, *PageID* 12958).  The effect of this was the distribution of the remaining Jordan-policy proceeds to the Jordan Investors who participated in the settlement.  Although Plaintiffs chose not to join the Jordan settlement, neither this Court nor the Court of Appeals limited their right "to pursue any independent legal action that may be available to them ...."  (Doc. #1207, *PageID*# 12956; Doc. #1304, *PageID*# 13894).

Plaintiffs' present Complaints and claims of conversion and thing-in-action have generated a "independent legal action."  But, is it one "that may be available to them" to

---

[5] *Sine qua non* ("without which not") refers to "an indispensable condition or thing; something on which something else necessarily depends."  *Sine qua non*, <u>Black's Law Dictionary</u> (8th ed. 2004).

recover their entire ownership interest in the Jordan-policy proceeds?  In other words, is there a legal basis for Plaintiffs' conversion and thing-in-action claims?

"In Ohio, a conversion claim requires a plaintiff to demonstrate not only that the defendant dispossessed the plaintiff of its property and caused the plaintiff damage, but also that the defendant's interference with the plaintiff's property rights was 'wrongful.'" *Kehoe Component Sales Inc. v. Best Lighting Products, Inc*., 796 F.3d 576, 592 (6th Cir. 2015) (citing *Dice v. White Family Cos*., 173 Ohio App.3d 472, 878 N.E.2d 1105, 1109 (2007).  Oklahoma law requires similar wrongful conduct control of another's personal property.  *See Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1228 (10th Cir. 2013) (quoting, in part, *Welty v. Martinaire of Okla., Inc*., 867 P.2d 1273, 1275 (Okla. 1994)).  Under both states' law, Plaintiffs' conversion/thing-in-action claims fail as matter of law because neither the Receiver or the Receivership wrongfully exercised dominion over Plaintiffs' ownership interest in the Jordan-policy proceeds.  Upon his appointment, the Receiver became an officer of the Court.  *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).  His power to receive and secure the Jordan-policy benefits as the LifeTime Receiver was established by the Court Orders appointing him to be the Receiver.  (Doc. #s 6, 23).  He managed the Jordan-policy proceeds and settled the ownership dispute in his role as Receiver and with Court approval.  Plaintiff's Complaints and proposed Amended Complaints fail to allege facts sufficient to raise an inference that the Receiver acted wrongfully by receiving, managing, and distributing the

Jordan-policy benefits as ordered by the Court.  As a result, their allegation that the Receiver acted wrongfully and thus converted the Jordan-policy benefits is conclusory. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (labels and conclusion insufficient to raise a plausible claim for relief).  Given this, and because the Receiver acted within his court-appointed authority, Plaintiffs' allegations do not support plausible claims of conversion under Ohio or Oklahoma law or thing-in-action under Oklahoma law.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678- (2009) (considering allegations in context, a Complaint must raise non-speculative, plausible claim to relief).

Lastly, without a plausible claim for a thing-in-action, Plaintiffs' proposed amended Complaints are futile.  Their Motions for Leave to Amend therefore lack merit. *See Miller v. Calhoun Cty*., 408 F.3d 803, 817 (6th Cir. 2005).

## IT IS THEREFORE ORDERED THAT:

1.   The Receiver's Motion for Summary Judgment (Doc. #1486) is GRANTED, and the Clerk of Court is directed to enter Judgment in favor of the Receiver; and

2.   Plaintiffs/Intervenors' Motion for Leave to Amend Complaint (Doc. #s 1488, 1490, 1492) are DENIED.


March 29, 2016

                                               s/Sharon L. Ovington
                                              Sharon L. Ovington
                                    Chief United States Magistrate Judge